<hr />

### THE ST. PAUL.

### THE MUNICIPAL.

#### (District Court, E. D. New York. June 22, 1903.)

1. SHIPPING—NEGLIGENT NAVIGATION—DAMAGE CAUSED BY SWELL FROM PASSING VESSEL.

The St. Paul, a large ocean steamship, with a displacement of some 13,000 tons, when approaching New York Harbor, met and passed a tug having two scows in tow on a hawser, and her swell caused the rear scow to dump her deck load of building stone. She passed the tows at a distance of 150 to 200 feet, and her half speed of 12 knots was slowed; and, according to the testimony of the captain and pilot, her engines were stopped when about opposite the tug, but such testimony was contradicted, and the fact was not established. *Held*, that as such testimony showed that, in the judgment of her officers, it was practicable and proper for her to stop her engines, the fact that she did not do so rendered her in fault, and liable for the damage caused; no fault being shown on the part of the tug.

In Admiralty. Action to recover damages for loss of cargo.

Hyland & Zabriskie, for libelants.
Carpenter & Park, for claimant of the Municipal.
Robinson, Biddle & Ward, for claimant of the St. Paul.

THOMAS, District Judge. The steamship St. Paul was 550 feet long, her beam was 63 feet, her draft was 26½ feet, and her tonnage displacement was estimated at 13,000 tons. Approaching the harbor of New York, she rounded the Southwest Spit in the Main Channel, and passed the outbound tug Municipal, towing two loaded scows singled out on a hawser about 50 fathoms in length. The steamship's swell caused the rear scow to dump her deck load of building stone. It is probable that the easterly set of the tide carried the tail of the tow farther eastward than her navigators appreciated; but the tug was some 100 feet from the Black Buoy Line, as Capt. Jamison, of the St. Paul, testified. In such case the tow, about 600 feet in length, could not have obstructed anything of the easterly side of the channel, inasmuch as Capt. Jamison stated that the tow made an angle of 25

or 30 degrees with the center line of the channel. The witnesses for the St. Paul further state that the Municipal was pulling diligently to the westward. What fault, then, can be ascribed to her? Certainly she was at liberty to use the channel. The witnesses for the St. Paul place that vessel, at the time of passing the tow, within 50 feet of the Red Buoy Line, and yet state that she cleared the tow by only 150 or 200 feet. As the channel is 1,200, or at least 1,000, feet wide, the alleged proximity of the steamship to the Red Buoy Line is probably inaccurate. It is more probable that she was near the center of the easterly half of the channel. The captain and pilot recognized the danger of passing the tow before reaching it, and state that the half speed of 12 knots was slowed, and that when opposite the tug the engines of the steamship were stopped. The deck log does not show that the engines were stopped, and the engineer's log was not produced. The deck log shows, "1:47 slow for tug Municipal with two barges." It is difficult to conceive that an entry of the stopping of the engine would have been omitted, had it occurred, and the single entry made as above. The evidence that the engines were stopped shows that it was practicable to stop, and to keep them stopped, from the time of meeting the tug until the tow cleared, as the pilot testified was done. Capt. Jamison testified: "Q. How far past the tug had you got when you started up the engines ahead? A. 150 feet." The pilot states that they were not started until the tow was past. According to Jamison, the engines were started forward before the steamship had cleared the scows. Here is a discrepancy. The St. Paul did not have much sea room on her starboard side, as she was within 200 or 300 feet of too shoal water; the tide tended strongly to carry her to such shoal; and, in a position so precarious, the court, although assisted by the evidence of the scowmen and tug's crew, should not oppose its judgment to that of the steamship's skilled officers. But the question whether the engines were stopped, and kept in that condition until the tow cleared, is quite different. The occurrence was not recalled to Capt. Jamison until many months afterwards, and presumably the same is true as to the others on the bridge. In such case the omission in the log, and the failure to produce the engineer's log, cannot be overlooked. The deck log has a history of the event, and it must be regarded as the correct and only record of what was done with the engines. This, considered in connection with the opposing evidence on the part of the tow as to the speed of the St. Paul, leads to the conclusion that the steamship's engines were not stopped, or were not kept so, until the tow cleared. Hence, what was feasible, and what Capt. Jamison and others in charge of the St. Paul evidently thought it proper to do under the circumstances, the court may say should have been done. If it was done, the St. Paul should be acquitted of fault, but, in the absence of satisfactory explanation of the omission from the log of the alleged fact, the conclusion is enforced that it did not happen.

The decree will proceed against the St. Paul alone.